# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

JULIE VAILS, M.D.,

        Plaintiff,

vs.

UNITED COMMUNITY HEALTH
CENTER, INC., MARK PROSSER,
HUGH PERRY, BILL KRUSE, and
DIANE HAMILTON,

        Defendants.

No. C11-4048-LTS

**MEMORANDUM OPINION AND
ORDER REGARDING CROSS-
MOTIONS FOR SUMMARY
JUDGMENT**

---

### *TABLE OF CONTENTS*

*PROCEDURAL HISTORY* ........................................................................... *2*

*RELEVANT FACTS* ................................................................................. *3*

*SUMMARY JUDGMENT STANDARDS* ..................................................... *11*

*ANALYSIS* ........................................................................................... *12*
    *I.*     *Defendants' Motion For Partial Summary Judgment* ..................... *12*
        *A.*     *Claims Directed at UCHC* ................................................ *13*
            *1.*     *Wrongful Termination In Violation Of Iowa Public
                 Policy* ................................................................. *13*
                 *a.*     *The Alleged "At-Will Employee" Requirement* .... *13*
                 *b.*     *The Elements Of The Claim* ........................... *18*
            *2.*     *Promissory Estoppel* ............................................. *24*
        *B.*     *Claims Directed at the Individual Defendants* ..................... *26*
            *1.*     *Nonprofit Director Immunity* ................................... *26*
            *2.*     *Tortious Interference With Employment Contract* ......... *31*
                 *a.*     *Officer And Director Immunity* ....................... *31*
                 *b.*     *Improper Interference* ................................. *33*
            *3.*     *Fraud* ................................................................. *34*
        *C.*     *Damages For Breach of Contract* ..................................... *36*
    *II.*     *Vails' Motion For Partial Summary Judgment* ........................... *42*

*CONCLUSION* ...................................................................................... *46*

This matter is before me on defendants' September 14, 2012, motion for partial summary judgment (Doc. No. 17) and plaintiff's September 17, 2012, motion for partial summary judgment (Doc. No. 20). I conducted a hearing on both motions on November 7, 2012. Attorneys Stanley Munger and Jay Denne appeared for plaintiff. Attorneys Mary Funk and David Bower appeared for defendants. Both motions are now fully submitted.

## *PROCEDURAL HISTORY*

Plaintiff Julie Vails, M.D., filed this action on May 20, 2011. Her complaint (Doc. No. 1) includes a jury demand and names five defendants: United Community Health Center, Inc. ("UCHC"), Mark Prosser, Hugh Perry, Bill Kruse and Diane Hamilton. Vails invokes the court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. She alleges that UCHC is an Iowa corporation doing business in Iowa and that the four individual defendants were members of UCHC's executive committee during the relevant period of time.

Vails alleges that she had a successful medical practice in California and was solicited by UCHC to leave that practice to become an employee of UCHC in Storm Lake, Iowa. She further alleges that she entered into a written employment contract with UCHC and that UCHC breached that contract. Her causes of action are as follows:

| | |
|---|---|
| Count I | Breach of contract (against UCHC) |
| Count II | Wrongful termination in violation of Iowa public policy (against UCHC) |
| Count III | Tortious interference with employment contract (against the four individual defendants) |
| Count IV | Fraud (against the four individual defendants) |

Count V                Promissory Estoppel (against UCHC)[1]

Defendants filed their answer and affirmative defenses (Doc. No. 4) on June 27, 2012. The parties subsequently consented to trial, disposition and judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This case was assigned to me on June 8, 2012. Trial is scheduled to begin January 22, 2013.

Defendants' motion for partial summary judgment seeks dismissal of Counts II, III, IV and V. According to defendants, "there are material factual disputes as to Plaintiff's breach of contract claim [Count I]." Doc. No. 17-4 at brief page 1. Vails seeks summary judgment with regard to Count I. She contends that UCHC breached the employment agreement in various ways and that one breach, in particular, is undisputed. Specifically, she contends that she was "not provided time to work on the administrative component of her job as set forth in the contract." Doc. No. 20 at 1. She further contends that the amount of her damages for breach (other than reputational damages) is undisputed. Doc. No. 20-1 at brief pages 6-7.

## RELEVANT FACTS

Because both sides seek entry of partial summary judgment, I will provide an overview of the basic, relevant facts here. In my analysis of each motion I will set forth additional facts as viewed in a light most favorable to the resisting party.

*The Parties.* Vails currently resides in the state of Washington. She received her medical degree in 1999. In 2002, she established a private medical practice in California, which she maintained until joining UCHC in 2010.

UCHC is a nonprofit corporation organized under Iowa Code chapter 504 that operates a community health center in Storm Lake. UCHC is a Federally Qualified Health Center that provides services to a "medically underserved population" as

---

[1] While the complaint asserts Count V against all defendants, Vails now states that it is directed only against UCHC. *See* Doc. No. 26-1 at 11.

defined by federal law.  UCHC's bylaws provide that its affairs are to be managed by a board of directors.  At all relevant times, defendants Prosser, Perry, Kruse and Hamilton (collectively "the Individual Defendants") were members of UCHC's board of directors and served as members of the executive committee.  Prosser served as the Chairperson of the executive committee.  All members of UCHC's board of directors are unpaid volunteers.  UCHC does not pay dividends or share profits with its members, directors or officers.

*UCHC's History.*  UCHC was formed in 2004.  Under its bylaws, the board of directors is "responsible for the employment of a Chief Executive Officer" who, in turn, is responsible for carrying out the "management function of staffing, and directing and controlling the operations of the health center for the governing body."  UCHC employed its first CEO, Renea Seagren, in 2004.  UCHC hired its first medical provider, an Advanced Registered Nurse Practitioner (ARNP), in 2006, and began providing medical services to patients shortly thereafter.

In early 2007, UCHC hired Dr. Ubaldo Salazar to be its first full-time physician and Medical Director.  As Medical Director, Salazar provided medical care to patients and performed various administrative functions.  In 2009, UCHC learned that Dr. Salazar did not intend to continue his employment beyond the term of his contract and began searching for a replacement.

*The Employment Agreement*.  In early 2010, a third-party recruiting service brought Vails to UCHC's attention.  After some initial communications, Vails agreed to travel to Storm Lake from April 12-14, 2010.  While in Storm Lake, she interviewed with Seagren, toured UCHC, the community and the local hospital (Buena Vista Regional Medical Center), met the Individual Defendants and other board members and met with some of UCHC's staff.

Seagren, acting for UCHC, offered Vails the position of Medical Director while Vails was still in Storm Lake.  Seagren provided Vails with a draft employment agreement and the two of them discussed certain terms.  Vails did not retain an attorney

to review the draft or otherwise advise her during the negotiations. Instead, she negotiated directly with Seagren.[2] Vails sought and obtained certain changes to the first draft, including an increase in the proposed salary, a change in the allocation of her time between clinical and administrative duties and an increase in the allowance for moving expenses. She signed the final version (the "Agreement") on April 16, 2010. She read the Agreement before signing it.

The Agreement had a commencement date of July 5, 2010, and an initial term of three years. It further provided for automatic one-year renewals unless either side elected not to renew. Vails' primary duties were the provision of medical care to UCHC's patients (in accordance with "Exhibit A"), the provision of "administrative duties" (in accordance with "Exhibit B"), and the provision of "any other administrative duties the Board may reasonably assign." Agreement ¶ 2. The Agreement further stated:

> Doctor shall devote a minimum of 40 total hours per week toward the provision of clinical and administrative services hereunder to the Clinic ("Work Week") in alignment with the hours of operation of the Clinic. Unless otherwise agreed to by the parties in writing, Doctor shall devote on average a minimum of 24 hours per Work Week to providing patient care and a minimum of 16 hours per Work Week to providing administrative duties to the Clinic as the Medical Director. Doctor shall maintain reasonable hours so that a practice can be developed.

*Id.* The Agreement stated that when more than one physician was employed by UCHC, Vails agreed to "split call coverage and rounds equally with the other physician(s)." *Id.*

---

[2] In her response to defendants' statement of undisputed material facts, Vails denies defendants' statement that UCHC's board members did not participate in the negotiations and expressly asserts that board members "participated in the negotiation process." Doc. No. 26-3 at ¶ 22. However, she does not cite to any portion of the summary judgment record in support of this contention. As such, she is deemed to have admitted that no board members participated in the negotiations. *See* Local Rule 56(b). In any event, she testified that Seagren was the only representative of UCHC with whom she negotiated the terms of the employment agreement. Doc. No. 17-2 at App. pages 47-48.

The Agreement called for Vails to receive an annual salary of $225,000, paid time off, continuing education, various fringe benefits, malpractice insurance and up to $10,000 for relocation expenses. Agreement ¶ 5. It also included an integration clause:

> The Agreement, including Schedules, Exhibits, and Attachments, if any, represents the entire understanding between the parties. Any prior agreements between the parties as to the subject matter of the Agreement are hereby expressly terminated.

Agreement ¶ 17.

*Vails' Employment at UCHC.* Vails' employment began on July 5, 2010. App. at 1-17. In early August, Seagren announced that she was resigning her position as UCHC's CEO. Seagren agreed that her resignation would be effective October 31, 2010. UCHC established a three-person management team to make day-to-day operational decisions pending the recruitment and hiring of a new CEO. The team included Vails, Rich Gehrig (UCHC's Chief Financial Officer) and Dr. Mike Munilla (UCHC's Dental Director).

In September 2010, Vails retained her daughter, Genevieve Vails, as an independent contractor to provide administrative assistance for UCHC. The parties appear to dispute whether Vails had the authority to make this decision. On September 23, 2010, Seagren sent an email message to several recipients expressing concern about the fact that Genevieve was given a UCHC email address, "which gives her access to the shared drive and all UCHC documents contained therein." Doc. 17-3 at App. page 184. Vails replied on the same day in an email sent to Seagren and several others:

> Renea -I requested computer access for her today to any desktop solely to access IRIS. It was stated to be a temporary request so she may complete the IRIS updates. I thought it better than for her to use my zylock to complete this task which would delay my ability to enter patient medication and complete superbills. She has not used the access to date. I have no idea why an email address was added. I will ask Matt to delete it.

Here is a copy of my email to him: Matt- Can you get my daughter a temp log on. She needs to work on IRIS today. Help?

That said Renea, why do you persist in creating chaos and instigating problems where none exists? This organization needs to immediately stop running on fear. I've had enough. Are you trying to run me out of here? What is your goal?

And Maria you should have asked me before you asked Matt. Sometimes a simple discussion is all that is needed. I was trying not to ask you to do one more thing. I was trying to be self sufficient as you have already stated you are overwhelmed and IRIS is my project. I was trying to make sure that Genevieve did not bug you for any reason. She is here to help us, not harm us. How can anyone work in this environment?

Julie

*Id.* at App. page 164.

Also on September 23, 2010, Seagren sent an email to Vails and others at UCHC expressing concerns about Vails' direct communications with Dr. Brennan, a locum tenens physician.[3]   Seagren claimed, among other things, that Vails' communications with Brennan created confusion as to scheduling issues.  She stated that Vails should "stay out of direct communications with the locum physicians and bring all issues to be resolved through me."  *Id.* at App. page 163.  Vails replied as follows:

Renea- What are you talking about? This line of questioning is completely uncalled for. I have no idea what you are talking about. Nor do I appreciate you speaking to me in this tone. I did not talk to the Locum any other time than the one day you requested that I do so and I completely accepted the schedule you proposed for him without changes in his schedule which resulted in Maria having to move innumerous patients (upwards of 50). Check your facts and leave me alone.

The Board can contact me at home 213-1322.

---

[3]A locum tenens physician is, in general, one who fills in and provides services for a hospital or clinic when the facility is short-staffed.

*Id.* Vails directed her reply to the original recipients of Seagren's message and to the Individual Defendants as members of the UCHC board's executive committee. *Id.*

Munilla, one of the other members of the three-person management team, responded to Vails' message by sending an email to the executive committee on the evening of September 23, 2010. In his message, Munilla expressed concern about Vails by stating, among other things:

> We have had several issues where our management team has made recommendations or we have not yet agreed upon a decision and she [Vails] moves forward exactly as she decides regardless of the decision/suggestions made.
>
> . . . Renea is still our executive director and after her years of selfless work to bring this clinic to where we are today deserves the proper respect and professional courtesy duly deserved. The manner, tone and impression conveyed speak nothing of a professional behavior nor is it acceptable. I have worked extensively with Rich, Maria and Renea over the past year and we have worked together very harmoniously. I see that changing and I see the stress starting to show.
>
> I am sharing my opinion with you all since you were address[ed] personally in Dr. Vails email. This matter of "I will do as I please" needs to be addressed before our entire clinic suffers and valued employees are lost.

*Id.* at App. page 172.

On September 24, 2010, Vails sent an email to Prosser requesting a meeting with the executive committee and stating:

> I request this meeting for the following reasons. I need the inappropriate accusations, hostility and harassment to stop immediately. I also request direction in how best to accomplish the needs of UCHC medical department within the context of our interim management team. As my efforts based upon my understanding of my job description to date have been met with considerable blockades, I request review of the purpose for which I was hired, the most critical tasks among that list, and confirmation of my authority to make decisions and follow through on those goals. I would like to confirm that answer is in alignment with what

> I was told during my recruitment and why I accepted the offer. If in fact there is no alignment, I would request determining a course of action that would allow me to immediately seek employment elsewhere.

*Id.* at App. page 152. Prosser advised Vails that it would take some time to set up a meeting with the entire executive committee. Prosser and Vails ultimately agreed to schedule the meeting on October 13, 2010.

On Friday, October 8, 2010, Vails and Seagren had a verbal confrontation after Seagren expressed concern about the fact that Vails had moved the medical charts of all UCHC employees into her own office. Vails contends that Seagren raised her voice during this exchange. Shortly after the exchange, Vails left for the day, stating that she was sick. A number of patients were still on the schedule to be seen by Vails later in the day.

On Monday, October 11, 2010, Vails returned to work, went to Seagren's office and stated: "I don't want you to speak to me ever again," and "Do not come to me, and just leave me alone." This led to another exchange of words between Vails and Seagren.

On October 13, 2010, Vails attended the scheduled meeting with the executive committee. She brought an attorney, John Murray, to represent her during the meeting. Murray and Vails presented a written memorandum to the committee that included the following statement:

> This is to specifically request that UCHC cure the hostile work environment by doing the following:
>
> A) Direct Ms. Seagren that she is prohibited from entering the work facility; and
>
> B) Prohibit Ms. Seagren from communicating with any UCHC employees, including via email, phone calls, etc.

> I request that UCHC take these actions by no later than noon, October 14, 2010.

Doc. No. 17-3 at App. page 145. On October 14, 2010, UCHC's counsel sent a letter to Murray stating:

> Ms. Seagren by her own request will be limiting any contact with Dr. Vails and does not intend to communicate with Dr. Vails as Ms. Seagren also feels harassed by Dr. Vails' conduct. We assume based on the statements made by Dr. Vails that she will not approach Ms. Seagren or initiate contact with her. Ms. Seagren will not be in the office for any substantive period of time for the remainder of her tenure. Based on the statements of both it appears that they will have no contact prior to the end of Ms. Seagren's employment.

*Id.* at App. page 154-55. The letter also stated that Seagren, in her role of CEO, would need to continue to communicate with other UCHC employees through the end of the month, when her resignation would take effect. *Id.* at App. page 155.

Vails felt that the letter from UCHC's counsel was unacceptable, as she was concerned that Seagren would continue to send emails about Vails to the other members of the management team. Vails was also concerned that she would continue to encounter Seagren at UCHC until Seagren's employment ended.

***Vails' Departure from UCHC.*** On the afternoon of October 14, 2010, just after the noon deadline that Vails and her attorney had communicated the day before, Vails left work. She presented a doctor's note stating she needed to be off work for 30 days.

On October 22, 2010, Vails sent a letter to UCHC alleging violations of her employment agreement and certain acts of billing fraud by UCHC. She demanded that UCHC either (a) make various changes to her agreement or (b) make a severance payment to her in the amount of $270,308.28, plus $10,000 in attorney fees. UCHC rejected both proposals. Vails did not return to work.

## *SUMMARY JUDGMENT STANDARDS*

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (*quoting Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (*citing Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods,* 415 F.3d 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## *ANALYSIS*

### I.    *Defendants' Motion For Partial Summary Judgment*

As I noted earlier, defendants seek summary judgment on Count II (wrongful termination in violation of Iowa public policy), Count III (tortious interference with employment contract), Count IV (fraud) and Count V (promissory estoppel). Also, with regard to Count I (breach of contract), defendants seek summary judgment as to Vails' claim for damages relating to the purchase, sale and maintenance of her home.

Counts II and V are directed only at UCHC, while Counts III and IV are directed only at the Individual Defendants. I address the two sets of claims separately.

## A. Claims Directed at UCHC

### 1. Wrongful Termination In Violation Of Iowa Public Policy

In Count II, Vails contends UCHC committed the tort of wrongful termination by terminating her employment[4] for reasons that violate the public policy of the state of Iowa. UCHC attacks this claim in two ways. First, UCHC contends that Vails is not entitled to assert this claim because she was not an at-will employee. Second, UCHC argues that Vails has failed as a matter of law to establish the elements of the claim.

#### a. The Alleged "At-Will Employee" Requirement

Vails and UCHC were parties to a written employment agreement that included a three-year term, with only limited grounds for earlier termination by UCHC. As such, Vails was not an at-will employee. *See, e.g., Borschel v. City of Perry*, 512 N.W.2d 565, 566 (Iowa 1994) (an at-will employee is one who "may be discharged at any time, for any reason, or for no reason at all."). UCHC seeks summary judgment on grounds that being an at-will employee "is a factual prerequisite to being able to state a claim for wrongful termination in violation of public policy." Doc. No. 17-4 at brief page 20.

In support of this argument, UCHC cites two Iowa federal district court decisions – one from this district and one from the Southern District. In *Clark v. Eagle*

---

[4]Vails does not claim UCHC expressly terminated her employment but, instead, that UCHC constructively discharged her by deliberately making her working conditions so intolerable that she was forced into an involuntary resignation. UCHC does not argue that Vails is unable to establish a constructive discharge as a matter of law. As such, for purposes of evaluating UCHC's motion for partial summary judgment, I will assume that a reasonable jury could find that Vails was constructively discharged. Of course, a constructive discharge by itself does not give rise to a cause of action. Instead, a constructive discharge is actionable only if an express discharge would have been wrongful under the same circumstances. *See Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 643 (Iowa 2000).

*Ottawa, LLC,* No. 06-CV-2028-LRR, 2007 WL 581650 (N.D. Iowa Feb. 20, 2007), the court noted that the tort of wrongful discharge derived as an exception to Iowa's at-will employment doctrine. The court then concluded that under Iowa law, a plaintiff must show he or she was an at-will employee in order to state a claim for wrongful discharge. *Id.* at *5. Five months later, in *Gries v. AKAL Security, Inc.*, No. 06-CV-33-LRR, 2007 WL 2710034 (S.D. Iowa Aug. 27, 2007), the court cited *Clark* in a footnote as the sole authority for the proposition that being an at-will employee is a requirement for this cause of action. *Id.* at *35 n.14.

It is true that the tort of wrongful termination in violation of public policy developed as a necessary exception to the at-will employment doctrine. The Iowa Supreme Court first recognized the tort in 1988, holding that "an employee's right to seek the compensation which is granted by law for work-related injuries should not be interfered with regardless of the terms of the contract of hire." *Springer v. Weeks and Leo Co.*, 429 N.W.2d 558, 560 (Iowa 1988). At that time, the Court referred to the new tort as "tortious interference with the contract of hire." *Id.* In arguing against the cause of action, the defendant in *Springer* relied on the plaintiff's status as an at-will employee and argued that creating a remedy for termination in violation of public policy should be left to legislature. The Court responded as follows:

> We disagree. The issue is, we believe, a generic one more nearly related to the common-law tort which has been recognized for improper interference with existing business relationships than with any single substantive topic with which the legislature might deal. It is not, for example, a workers' compensation issue. It is an employment law issue which may arise in a variety of circumstances, one of which happens to involve workers' compensation claims. Moreover, by sanctioning wrongful discharge actions for contravention of a public policy which has been articulated in a statutory scheme, we are acting to advance a legislatively declared goal. . . .
>
> When we recognized the tort of interference with a business relationship . . . , we advanced the view that this would protect against "interference with reasonable economic expectancies." . . .

> We conclude that the plaintiff in the present case is seeking protection against a clearly improper interference with an interest which is both ascertainable and worthy of protection.

*Id*. at 561 [citations omitted]. In short, while the tort was created in the context of at-will employment, the Iowa Supreme Court explained the tort by analogy to the tort of tortious interference with business relationships. The Court found that even an at-will employee, who generally is subject to discharge at any time for any reason, has an interest or expectation that is "both ascertainable and worthy of protection."

The Iowa Supreme Court has never held that at-will employment status is a required element of the tort. Indeed, the Court appears to have assumed otherwise. For example, in *Conaway v. Webster City Products Co.,* 431 N.W.2d 795 (Iowa 1988), a case decided just two months after *Springer,* the Court considered an appeal brought by two employees who alleged discharge in retaliation for filing workers' compensation claims. Both employees were covered by collective bargaining agreements. The trial court dismissed their claims on ground that they were preempted by Section 301 of the federal Labor Management Relations Act (LMRA). The Iowa Supreme Court noted that having recognized the new tort of wrongful discharge in *Springer*, it was being "called upon to decide whether an employee covered by a collective-bargaining agreement providing a contractual remedy for discharge without just cause may maintain such an action." *Id*. at 796.

At no point in its analysis of the issues in *Conaway* did the Court suggest that at-will status is a required prerequisite for asserting a wrongful discharge claim. Instead, the Court undertook a detailed analysis of the preemption issue and held that the claims were not preempted by the LMRA. *Id*. at 799-800. Had the Court intended to limit the tort to at-will employees with no contractual protection, it easily could have done so in *Conaway* and, thereby, avoided the preemption question. Instead, the Court

assumed that the plaintiffs' claims were "recognizable state tort claims" despite the fact that neither plaintiff was an at-will employee. *Id.* at 800.

Similarly, in *Sanford v. Meadow Gold Dairies, Inc.*, 534 N.W.2d 410 (Iowa 1995), the plaintiff was a bargaining unit employee who claimed he was discharged in violation of public policy after filing a workers' compensation claim. The court discussed the fact that the plaintiff was protected by a collective bargaining agreement and considered the issue of whether his claim was preempted by the LMRA. *Id.* at 414. The court again found that the claim was not preempted and affirmed judgment in plaintiff's favor on the wrongful discharge claim. *Id.* The Court did not reject the claim on grounds that the plaintiff, as a bargaining unit employee, was protected by a contract. Moreover, in describing the tort, the Court stated:

> Sanford's retaliatory discharge claim rests on our holdings that public policy is violated when an employee, <u>even an employee at-will</u>, is discharged as a result of seeking workers' compensation benefits. An essential element of the claim is a showing concerning the employer's specific motivation in firing; it must appear that the discharge was prompted by the filing of the workers' compensation claim.

*Id.* at 412 [emphasis added]. The phrase "even an employee at-will" is extremely inclusive. Instead of holding that "only" at-will employees are protected from being discharged in violation of public policy, the Court pointed out that "even" those employees enjoy that protection.

While conceding that the Iowa Supreme Court has never adopted their argument that only at-will employees may assert a tort claim for wrongful discharge, defendants rely on *Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681 (Iowa 2001), as evidence that the Court would do so, if asked. In *Harvey,* the Court declined to extend the tort of wrongful discharge to an independent contractor. *Id.* at 684. In the course of its analysis, the Court compared the negotiated contractual protections available to an independent contractor to the relatively-unprotected situation faced by at-will employees. *Id.* This contrast formed one basis for the Court's decision. However, the

Court relied on other factors, as well, including the express language of the statute evidencing a strong public policy against retaliatory termination of employees and residents. *Id.* at 685. *Harvey* does not hold, or even suggest in *dicta*, that an employee may maintain a claim for wrongful termination only if he or she was employed on an at-will basis.

When there is no state supreme court case directly on point, a federal court sitting in diversity must predict how the state supreme court would rule if faced with the issue. *See, e.g., Northland Cas. Co. v. Meeks*, 540 F.3d 869, 874 (8th Cir. 2008). I do not believe that the Iowa Supreme Court would adopt defendants' argument and hold that the tort of wrongful discharge is available only to at-will employees. I base this prediction primarily on the Court's rulings in *Conaway* and *Sanford*. However, I also believe the Court would find persuasive the analysis undertaken by the Missouri Supreme Court in *Keveney v. Missouri Military Academy*, 304 S.W.3d 98 (Mo. 2010). In that case, the court acknowledged prior decisions that limited the tort of wrongful discharge in violation of public policy to at-will employees but noted that "none of these cases has offered a detailed justification for allowing an at-will employee to recover for wrongful discharge while denying the same remedy to a contract employee." *Id.* at 102. Upon examination of the issue, the court found "at least three compelling reasons for allowing contract employees to pursue an action for wrongful discharge in violation of public policy:"

1. Limiting the tort to at-will employees "fails to recognize the distinct underlying purpose of the wrongful discharge cause of action."

2. "[G]iven the distinct interests at issue in a wrongful discharge action, it follows that the remedies are distinct."

3. Allowing an at-will employee to pursue an action for wrongful discharge "illogically grants at will employees greater protection from these tortious terminations due to an erroneous presumption that the contractual employee does

> not need such protection" (quoting *Smith v. Bates Technical College,* 991 P.2d 1135, 1141 (Wash. 2000)).

*Keveney*, 304 S.W.2d at 102-03. For all of these reasons, the court abrogated its prior decisions to the contrary and held that contract employees may maintain a cause of action for wrongful discharge. *Id.* at 103.

*Keveney* appears to represent the most-recent analysis of this issue by the highest court of any state. I believe that its holding is well-reasoned and, more importantly, consistent with the Iowa Supreme Court's decisions in *Conaway* and *Sanford*. As such, I predict that the Iowa Supreme Court would not limit the tort of wrongful discharge to at-will employees and I respectfully disagree with the contrary statements in *Clark* and *Gries*. The fact that Vails was party to a written employment contract with UCHC does not prevent her from asserting a tort claim for wrongful discharge in violation of Iowa public policy.

### b. The Elements Of The Claim

Of course, just because Vails is eligible to assert this tort does not mean the record supports its submission to the jury. Under Iowa law, an employee asserting this claim must establish: (1) the existence of a clearly defined public policy that protects an activity; (2) that this policy would be undermined by a discharge from employment; (3) that the challenged discharge was the result of participating in the protected activity and (4) that there was lack of other justification for the termination. *Davis v. Horton*, 661 N.W.2d 533, 535 (Iowa 2003). UCHC contends that Vails has failed to generate genuine issues of material fact with regard to three of these elements.

### i. Clearly Defined Public Policy

The public policy at issue in a wrongful discharge claim must be "a well-recognized and defined public policy of the state," *Springer*, 429 N.W.2d at 560; *see also Davis*, 661 N.W.2d at 536 ("[Iowa courts] proceed cautiously and will only extend

18

. . . recognition to those policies that are well recognized and clearly defined."). Not all activities that are "encouraged and frequently beneficial," are "so imbued with public purpose as to satisfy the clarity element." *Davis*, 661 N.W.2d at 536. To determine whether a discharge jeopardizes public policy, the employee must show "the conduct engaged in not only furthered the public policy, but dismissal would have a chilling effect on the public policy by discouraging the conduct." *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 284 (Iowa 2000).

Vails contends that the federal False Claims Act, 18 U.S.C. § 1001, which makes it illegal to submit false claims to the federal government, along with various federal regulations concerning billing for medical services, give rise to a clearly defined public policy against defrauding the federal government. Doc. No. 26-1 at brief page 13 (citing Doc. No. 26-2 at ¶¶ 85-105[5]). Vails further notes the Iowa Court of Appeals has held that federal law, standing alone, can serve as the source of a clearly defined public policy for purposes of a wrongful discharge claim. *Smuck v. Nat'l Mgmt. Corp.*, 540 N.W.2d 669, 672 (Iowa Ct. App. 1995). In *Smuck*, as here, the plaintiff relied on the False Claims Act as establishing public policy and contended that he was

---

[5]Document 26-2 is Vails' Statement of Additional Material Facts ("SAF"), a document required by Local Rule 56(b)(3). Defendants rightly complain that Vails' SAF is a troubling document. *See* Doc. No. 28 at 1-2. In fact, it is ridiculous. Rule 56(b)(3) states that each individual statement of additional material fact "must be concise, numbered separately, and supported by references to" the record. Vails' SAF consists of 123 numbered paragraphs, including many lengthy paragraphs that contain five or more sentences and alleged facts. In other words, it is not "concise." Moreover, many of the paragraphs consist of long segments of interrogatory answers, witnesses' statements, etc., that were simply cut and pasted into the SAF. It is clear that no effort was made to limit the SAF to alleged facts that are actually "material," *i.e.*, potentially relevant to defendants' arguments. Nor was any effort made to limit the SAF to alleged facts supported by admissible evidence, rather than inadmissible speculation, opinions and hearsay. I believe that the primary purpose of the SAF was to place opposing counsel at a strategic disadvantage in light of Local Rule 56(d)'s requirement of a point-by-point reply to be filed within seven days after service of the SAF. Under the circumstances, counsel for defendants did an admirable job of replying within such a short timeframe. Had defendants moved to strike the SAF, or to require that it be re-cast, I would have granted the motion. In any event, I certainly will not deem defendants to have admitted any of the rambling assertions contained in the SAF.

discharged because he objected to his employer's effort to defraud the federal government. *Id.*

While the Iowa Supreme Court has not expressly adopted the holding in *Smuck*, it has cited *Smuck* favorably, with no suggestion of disagreement. *See Clements v. Gamblers Supply Mgmt. Co.*, 610 N.W.2d 847, 850 (Iowa 2000). As such, I agree with Vails that Iowa recognizes a clearly defined public policy against defrauding the federal government. I also agree that this policy would be undermined by discharging an employee who reports, or refuses to participate in, such conduct. For purposes of analyzing defendants' motion for partial summary judgment, Vails has established the first two elements of a wrongful discharge claim.

### ii.    *Protected Activity*

I must next determine if a reasonably jury could find that Vails engaged in protected activity, such as reporting or objecting to the alleged fraud, before October 14, 2010, the date she contends she was constructively discharged. Vails did submit various complaints about UCHC's practices to outside agencies after that date,[6] but she must show that her challenged discharge was caused by her protected activity. *See, e.g., Davis*, 661 N.W.2d at 535. As such, I will not consider any activity that occurred after October 14, 2010.

The Iowa Supreme Court has recognized four categories of protected activity: (1) exercising a statutory right or privilege; (2) refusing to commit an unlawful act; (3) performing a statutory obligation; and (4) reporting a statutory violation. *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 762 (Iowa 2009). Vails claims she engaged in category 2, by refusing to commit an unlawful act, and/or category 4, by reporting a statutory violation. While Vails made no secret of her feelings about Seagren, the record is far

---

[6]Defendants summarized Vails' post-employment complaints in Doc. No. 17-4, at note 18.

less explicit concerning any alleged refusal to act unlawfully or any reports of illegal conduct.

During oral argument, Vails' counsel stated that Vails relies on her monthly medical director reports to UCHC's board as her evidence of protected activity. However, Vails has cited to no specific portion of any report that remotely resembles a report that UCHC was defrauding the federal government. Indeed, in her deposition testimony she acknowledged that it would have been "tough" for a UCHC board member to read those reports and realize that she was alleging "fraudulent billing practices." Doc. No. 17-2 at App. page 63. Nor has she cited to any portion of her reports in which she advised the board that she was being asked to engage in illegal conduct and was refusing to do so. I have thoroughly reviewed all of the reports and find nothing that even arguably raises a genuine issue of material fact as to whether Vails engaged in protected activity by reporting, or expressing a refusal to participate in, efforts by UCHC to defraud the federal government.

In her resistance materials, Vails cited four paragraphs of her SAF in support of her claim that she engaged in protected activity. *See* Doc. No. 26-1 at 13 (citing SAF ¶¶ 89-90, 103-04). Paragraphs 89 and 90 simply quote Vails' interrogatory answers in this case, wherein she offered her opinions as to illegal or improper practices. The quotations include no assertions that Vails complained about these alleged practices prior to October 14, 2010.

Paragraph 103 includes a lengthy interrogatory answer excerpt that makes reference to alleged discussions between Vails and Seagren. Specifically, Vails contends that she discussed an "inappropriate policy on flu vaccines" with Seagren multiple times. However, nothing in paragraph 103 indicates that Vails reported to Seagren, or anyone else at UCHC, that UCHC was defrauding the federal government. Nor does the paragraph indicate that Vails was refusing a request to engage in illegal conduct.

Finally, paragraph 104 refers to a portion of Vails' deposition testimony containing her speculation that UCHC's board of directors must have known she was complaining about fraudulent billing practices because she brought that issue to the board's attention. In that testimony, Vails made it clear that she is relying on the written medical director's reports. *See* Doc. No. 17-2 at App. page 62. As noted above, nothing in those reports rose to the level of protected activity.

Vails cannot defeat defendants' motion for summary judgment on her wrongful discharge claim unless she shows there is evidence in the record that would allow a reasonable jury to find she engaged in protected activity. She has failed to make that showing. As such, I will grant the motion with regard to Count II.

### iii.    Causation

Even if there was some evidence that Vails engaged in protected activity before October 14, 2010, I would have to determine if there is a genuine issue of material fact as to whether she was constructively discharged as a result of participating in that activity. *Davis,* 661 N.W.2d at 535. A constructive discharge occurs "when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Haberer v. Woodbury Cnty.*, 560 N.W.2d 571, 575 (Iowa 1997). The test is whether a reasonable person in Vails' position would have felt compelled to resign. *Reihmann v. Foerstner,* 375 N.W.2d 677, 683 (Iowa 1985). Thus, Vails must show that a reasonable jury could find that UCHC retaliated against her protected activity by deliberately made her working conditions so intolerable that a reasonable person in her position would have felt forced to resign.

The causation standard is "high." *Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 301 (Iowa 1998). "The employee's engagement in protected conduct must be the *determinative* factor in the employer's decision to take adverse action against the

employee."[7] *Id.* [emphasis in original]. A factor is "determinative" if it is the reason that "tips the scales decisively one way or the other," even if it is not the predominant reason behind the employer's decision. *Id.* at 302 (quoting *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 686 (Iowa 1990)). As such, Vails must show that her protected activity was the determinative reason for UCHC's alleged decision to deliberately make her working conditions intolerable.

Vails' argument in favor of causation is confusing and unavailing. In her brief, she states she was "chastised by a Board member in front of the Board because of the protected activity." Doc. No. 26-1 at 14. She cites paragraph 104 of her SAF for this allegation, but neither that paragraph nor the deposition testimony cited therein contain support for this contention. She also alleges she was told she could no longer attend board meetings, except on a quarterly basis. *Id.* She apparently believes this was in retaliation for the allegedly-protected activity of reporting billing fraud to the board. As discussed above, however, she did not actually do so. Finally, she claims she "repeatedly addressed issues with Seagren and nothing was done." *Id.* A claim that "nothing was done" when Vails raised issues with Seagren does not even come close to establishing that UCHC deliberately made Vails' working conditions intolerable, let alone that UCHC did so in retaliation for some kind of protected activity.

In short, I find that the record does not raise a genuine issue of material fact as to whether any arguable protected activity by Vails caused UCHC to deliberately make her working conditions intolerable. This lack of evidence provides a second, alternative basis for granting defendants' motion for summary judgment with regard to Count II.

---

[7]The Iowa Supreme Court has stressed that the causation standard in a wrongful discharge case is higher than in a discrimination case. *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13 (Iowa 2009).

## 2. *Promissory Estoppel*

In Count V, Vails contends that UCHC, "during negotiations with Plaintiff to enter into the contract with UCHC, made clear promises/representations to Plaintiff." Doc. No. 1 at ¶ 60. She further contends that those promises/representations "were material to Plaintiff's negotiation of her contract with UCHC" and that she was harmed because they turned out to be false. *Id.* ¶¶ 61-63. As such, she contends she is entitled to recover actual and punitive damages under the doctrine of promissory estoppel.

The Iowa Supreme Court has recognized that in the absence of a contract, an employee may raise promissory estoppel to enforce certain promises made by an employer. *Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 48 (Iowa 1999). The elements of the claim are: (1) the existence of a clear and definite promise; (2) the promise was made with the promisor's clear understanding that the promisee was seeking an assurance upon which the promisee could rely and without which he or she would not act; (3) the promisee acted to his or her substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise. *Id.* at 49.

Of course, there <u>is</u> a contract in this case and that contract contains an integration clause:

> The Agreement, includes Schedules, Exhibits and Attachments, if any, represents the entire understanding between the parties. Any prior agreements between the parties as to the subject matter of the Agreement are hereby expressly terminated.

Doc. No. 17-2 at App. page 7 (¶ 17). Defendants argue that the parties' integrated written agreement prevents Vails from using promissory estoppel in an attempt to enforce any alleged, pre-agreement promises. In support of this argument, they cite *Whalen v. Connelly*, 545 N.W.2d 284 (Iowa 1996), and this court's decision in *DeJong v. City of Sioux Center*, 980 F. Supp. 1010, 1014 (N.D. Iowa 1997).

In *Whalen*, the Iowa Supreme Court discussed the effect of a fully integrated agreement and held that such an agreement precludes a party from enforcing alleged oral promises that relate to the subject matter of the agreement and are not contained in the agreement itself. 545 N.W.2d at 290-91, 294. In *DeJong*, this court held that "a claim for promissory estoppel cannot be used to enforce an oral promise where the parties have executed a valid, fully integrated document subsequent to the alleged oral representations." 980 F. Supp. at 1014. Thus, according to defendants, Vails may not maintain a claim for promissory estoppel based on any alleged promises or representations made before the parties entered into their fully-integrated agreement.

Vails, as it turns out, does not dispute this legal conclusion. Instead, she claims the "problem" with the argument is that it does not "address Vails' testimony as to the promises that were (1) made prior to the execution of the written agreement, but specifically re-affirmed following the execution of the written agreement, and (2) promises made after the execution of the agreement." Doc. No. 26-1 at 15. Unfortunately, Vails cites to no such testimony in her brief, apparently assuming that I will do the work for her by finding references to it somewhere in her rambling SAF, or elsewhere.[8]

I am not required to comb through the record to find evidence supporting Vails' resistance. *See, e.g., Scadden v. Nw. Iowa Hosp. Corp.*, 747 F. Supp. 2d 1130, 1132 (N.D. Iowa 2010). Moreover, even if Vails would have directed my attention to either (a) old clear and definite promises that were "re-affirmed" after the agreement was signed, or (b) new clear and definite promises made after the agreement was signed, she made no effort to show that there is evidence establishing the other elements of a promissory estoppel claim. For example, what evidence could allow the jury to find

---

[8] Vails' current contention that her promissory estoppel claim is based on promises that were either made or "re-affirmed" after she signed her employment agreement contradicts her complaint. In the complaint, Vails alleges that the promises at issue were made "during negotiations with Plaintiff" and that they "were material to Plaintiff's negotiation of her contract." Doc. No. 1 at ¶¶ 60-61.

that any such promise was made with UCHC's clear understanding that Vails was seeking an assurance upon which the she could rely and without which she would not act? Likewise, what evidence could allow the jury to find that Vails acted to her substantial detriment in reasonable reliance on such a promise? Vails has not even attempted to answer these basic questions.[9]

The existence of a fully-integrated agreement addressing the terms and conditions of Vails' employment is a significant barrier to any claim of promissory estoppel. To avoid summary judgment, Vails would have to produce evidence not only that post-contract promises were made, but also that all of the other elements of a promissory estoppel claim are present. She has not done so. As such, I will grant the defendants' motion for summary judgment on Count V.

### B.      Claims Directed at the Individual Defendants

As I noted earlier, Vails' claims against the four Individual Defendants are for tortious interference with employment contract (Count III) and fraud (Count IV). With regard to both claims, the Individual Defendants rely on the statutory immunity provisions of Iowa Code § 504.901. In the alternative, they contend that the record does not raise any genuine issues of material fact that would allow Vails to submit either claim to the jury. I will address the immunity argument first and will then proceed with an analysis of both claims.

### 1.      Nonprofit Director Immunity

The Individual Defendants argue they are immune from Vails' state law tort claims under section 504.901 of the Revised Iowa Nonprofit Corporation Act (NCA). Section 504.901, entitled "Personal Liability" states:

---

[9]During oral argument I asked Vails' counsel to describe any detrimental actions Vails took in reliance on any alleged oral promise that she was not already obligated to take by virtue of the parties' agreement. Counsel was not able to do so.

1. Except as otherwise provided in this chapter, a director, officer, employee, or member of a corporation is not liable for the corporation's debts or obligations and a director, officer, member, or other volunteer is not personally liable in that capacity to any person for any action taken or failure to take any action in the discharge of the person's duties except liability for any of the following:

>    a. The amount of any financial benefit to which the person is not entitled.

>    b. An intentional infliction of harm on the corporation or the members.

>    c. A violation of section 504.835.

>    d. An intentional violation of criminal law.

2. A provision set forth in the articles of incorporation eliminating or limiting the liability of a director to the corporation or its members for money damages for any action taken, or any failure to take any action, pursuant to section 504.202, subsection 2, paragraph "d", shall not affect the applicability of this section.

Iowa Code § 504.901.

There has been little judicial interpretation of this section. In *Collins v. Ctr. for Siouxland*, No. C10-4015-PAZ, 2011 WL 2893038, at *8 (N.D. Iowa July 15, 2011), former employees of a nonprofit corporation brought claims of retaliatory discharge in violation of the whistleblower provision of the False Claims Act and wrongful discharge in violation of Iowa public policy against the corporation and two individual defendants who held upper-level management positions. The individual defendants invoked immunity under section 504.901. *Collins*, 2011 WL 2893038 at *8. Plaintiffs argued the individual defendants were not immune because they had intentionally inflicted harm on the corporation by virtue of the corporation being vicariously liable for defendants' wrongful and intentional actions. *Id.* My predecessor, the Honorable Paul A. Zoss, rejected this argument on grounds that plaintiffs' claim was based on

harm *to them*, not the corporation. *Id.* He noted that the broad reading of the exception proposed by plaintiffs would, in effect, swallow the rule. *Id.*

The plaintiffs in *Collins* also argued that because they asserted a violation of the False Claims Act, the exception for an "intentional violation of criminal law" applied. *Id.* at *9. Judge Zoss rejected this argument because, again, the plaintiffs did not claim that the individual defendants were liable *to them* for violating federal law. Instead, plaintiffs claimed the defendants were liable to them for retaliatory discharge based on their attempt to report those alleged violations. *Id.* As a result of these holdings, the individual defendants were granted immunity under section 504.901.

Vails, who relies on the same two exceptions that were at issue in *Collins,* disagrees with the court's analysis, arguing that it is inconsistent with the general principle that individuals are responsible for the torts they commit. She cites *Jasper v. Nizam*, 764 N.W.2d 751 (Iowa 2009) in support of this proposition. In fact, it is section 504.901 – not the analysis in *Collins* – that alters the general principle. This is illustrated by *Jasper*, a case in which the Iowa Supreme Court considered whether an officer of a for-profit corporation may be held personally liable for the tort of wrongful discharge in violation of public policy. *Id.* at 775-76. The court held that a corporate officer can be personally liable for his or her conduct because the legal fiction of the corporation is designed to insulate officers from liability for corporate obligations, not from their own torts. *Id.* As Vails suggests, this holding indicates that individuals in Iowa are generally liable for their torts.

If the Iowa Legislature had not enacted section 504.901, this principle would presumably apply to officers and directors of nonprofit corporations. However, the Legislature <u>did</u> enact section 504.901. I must determine what impact that statute has on the general, common law principle described in *Jasper*. In interpreting the statute, my overriding goal is to determine legislative intent. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004). This intent can be derived from the language used, "subject matter, the object sought to be accomplished, the purpose to be served,

underlying policies, remedies provided, and consequences of the various interpretations." *Cox v. State*, 686 N.W.2d 209, 213 (Iowa 2004) (quoting *State v. Albrecht*, 657 N.W.2d 474, 479 (Iowa 2003)). Section 504.901 reflects an underlying policy of encouraging community members to serve as directors or officers of nonprofit organizations by granting them immunity and limiting their personal liability. The history of the statute also reflects the legislature's intent to reduce risk and uncertainty by narrowing the immunity exceptions. A previous version of this statute read:

> Except as otherwise provided in this chapter, a director, officer, employee, or member of the corporation is not liable on the corporation's debts nor obligations and a director, officer, member, or other volunteer is not personally liable in that capacity, for a claim based upon an act or omission of the person performed in the discharge of the person's duties, except for a breach of the duty of loyalty to the corporation, for acts or omissions not in good faith or which involve intentional misconduct or knowing violation of the law, or for a transaction from which the person derives an improper personal benefit.

Iowa Code § 504A.101 (repealed 2004). These exceptions to immunity were much broader than the four clearly defined exceptions in the Revised NCA, which went into effect on July 1, 2005. Notably, the revisions eliminated the exception for acts or omissions which involve intentional misconduct and narrowed it to intentional infliction of harm *on the corporation or the members*. In other words, the Legislature chose to increase the level of protection afforded to officers and directors of nonprofit corporations by reducing the scope of the exceptions to statutory immunity.

It is undisputed that UCHC is a nonprofit corporation and that the Individual Defendants are unpaid volunteers who served on UCHC's board of directors. As such, the Individual Defendants cannot be liable for any action taken in the discharge of their duties (or any failure to take action)[10] unless one of the four statutory exceptions applies. Vails relies on the first and fourth exceptions.

---

[10]In arguing against statutory immunity, Vails does not contend that the Individual Defendants were acting outside the scope of their duties as directors of UCHC. In any event, and as I will

With regard to the first exception, Vails has failed to demonstrate the first exception of intentional infliction of harm on the corporation or its members. Vails alleges harm to *herself* in her claim of intentional interference with contractual relations. In her complaint for this count, she only seeks damages that she incurred and makes no mention of harm to UCHC or its members as a result of the alleged interference with the contract she had with UCHC. Doc. No. 1 at ¶¶ 45, 50-51. She does not, for example, claim to be suing in a derivative capacity to recover on behalf of the corporation. Because she has failed to even allege intentional infliction of harm on the corporation or its members, this exception does not apply and the individual defendants maintain their immunity.

Vails has also failed to demonstrate the fourth exception of an intentional violation of criminal law. She alleges the individual defendants violated the False Claims Act by deceptively and fraudulently submitting bills to the federal government. Pl.'s Resistance, Doc. No. 26-1 at 5. In the hearing on this motion, Vails clarified she was not bringing a claim on behalf of the United States Government. Rather, she is using those alleged violations to demonstrate that she was discharged in retaliation for bringing up those violations to the Board. Because Vails is not attempting to hold the individual defendants liable for alleged violations of criminal law, but using them as facts to support her claim, the "intentional violation of criminal law" exception does not apply.

In short, I find that *Collins* correctly construes the scope and meaning of section 504.901 and that neither of the statutory exceptions Vails relies on are applicable to the facts of this case, even when those facts are viewed in a light most favorable to her. As such, I hold that the Individual Defendants are immune from personal liability for Vails' state law tort claims and will grant summary judgment in their favor on Counts

discuss further below in section I(B)(2)(a), there is no evidence that the Individual Defendants were acting outside the scope of their authority with regard to any of the actions or inactions alleged in this case.

III and IV. While this holding disposes of those two counts, I will address the defendants' alternative arguments, as well.

## 2. *Tortious Interference With Employment Contract*

In Count III, Vails claims the Individual Defendants are liable for tortuously interfering with her contract of employment with UCHC. In response, the defendants contend (a) directors of a corporation cannot be liable for interference with another's contract of employment with that corporation and, in any event, (b) Vails cannot establish "improper" interference by any of the Individual Defendants.

### a. *Officer And Director Immunity*

The Iowa Supreme Court has held that an officer or director of a corporation generally cannot be held liable for tortious interference with another's contract of employment with the company. *See Bossuyt v. Osage Farmers Nat'l Bank,* 360 N.W.2d 769, 779 (Iowa 1985); *Harbit v. Voss Petroleum, Inc.*, 553 N.W.2d 329, 331 (Iowa 1996). In *Bossuyt*, the Court quoted *Application of Brookside Mills*, 94 N.Y.S.2d 509, 518 (N.Y. App. Div. 1950) which stated:

> The decisions are clear that an officer or director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken. . . . To hold otherwise would be dangerous doctrine, and would subject corporate officers and directors continually to liability on corporate contracts and go far toward undermining the limitation of liability which is one of the principal objects of corporations.

360 N.W.2d at 779 (citations omitted). The Court has described this protection from liability as a qualified immunity that applies so long as the individual officer or director was acting within the scope of his or her authority at the time of the alleged interference. *Grimm v. US W. Commc'ns, Inc.*, 644 N.W.2d 8, 12-13 (Iowa 2002).

To defeat the privilege, there must be evidence of "bad faith, fraud, or improper means." *Id.* at 12.[11] Thus, the immunity is closely related to the business judgment rule, which protects corporate directors from liability for decisions that are made in good faith, that are reasonably prudent and that the directors believe to be in the corporate interest. *See, e.g., Hanrahan v. Kruidenier,* 473 N.W.2d 184, 186 (Iowa 1991).[12]

Here, Vails' claim of interference against the Individual Defendants is not exactly easy to comprehend. As best as I can tell, she claims they "interfered" by doing nothing. That is, she contends they knew about Seagren's alleged harassment but ignored her "pleas for help." She also contends they should have complied with her demand that Seagren be barred from the premises and prohibited from communicating with any UCHC employees during the remaining two weeks before Seagren's resignation became effective. *See* Doc. No. 26-1 at 9. In short, Vails alleges that the Individual Defendants favored Seagren over Vails and therefore failed to stop Seagren from making Vails' life miserable because they were "part of the Seagren clique." *Id.*

Even if such inaction could constitute intentional interference with Vails' contract, I find as a matter of law that it is protected by Iowa's qualified immunity in favor of corporate officers and directors. Assuming it is true that the directors took Seagren's side, and supported her over Vails, there is no evidence that this decision

---

[11]Vail cites *Kern v. Palmer College of Chiropractic*, 757 N.W.2d 651 (Iowa 2008), as a case in which the Iowa Supreme Court did not apply the qualified immunity afforded to directors and officers. *Kern* is somewhat unique in that the trial court had granted summary judgment in favor of the individual defendants for other reasons, without specifically addressing the tortious interference claim against them. *Id.* at 661. On appeal, the Supreme Court analyzed that claim but made no mention of qualified immunity. Instead, it reviewed the elements of the tort and found there was sufficient evidence in the record to maintain a tortious interference claim against one individual defendant. *Id.* at 664-65. It is possible that the defendants in *Kern* simply failed to raise the qualified immunity issue. In any event, I do not read *Kern* as abrogating the qualified immunity recognized in prior cases.

[12]The business judgment rule applies to directors of nonprofit corporations in Iowa. *Oberbillig v. West Grand Tower Condominium Ass'n*, 807 N.W.2d 143, 155-56 (Iowa 2011).

resulted from bad faith or fraud. Vails' effort to question the directors' motives amounts to little more than noting that they were friends of Seagren's and, in some cases, members of the same church. The mere existence of social relationships does not come close to raising an issue for the jury as to whether the Individual Defendants acted in bad faith and in disregard of their fiduciary obligations to UCHC.

While Vails may believe the Individual Defendants acted foolishly, she has not pointed to evidence that could allow the jury to find they acted outside the scope of their authority as directors of UCHC. As such, even if they interfered with her contract they are entitled to the protection afforded by Iowa's qualified immunity.

### b.    Improper Interference

Under Iowa law, the elements of a claim for tortious interference with an existing contract are: (1) plaintiff had a contract with a third party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted. *Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 243 (Iowa 2006). Defendants contend there is no evidence supporting the third element. In particular, they argue that there is no basis in the record for a finding that they acted improperly.

The following factors are considered in deciding whether a defendant's interference with a contract was "improper":

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Hunter v. Bd. of Trs. of Broadlawns Med. Ctr.*, 481 N.W.2d 510, 518 (Iowa 1992) (quoting Restatement (Second) of Torts § 767 (1981)). Here, both sides focus on the

"motive" factor. Vails relies on *Kern* and contends that summary judgment must be denied if there is evidence of conduct by a defendant that is "dishonest, fraudulent, malicious, or otherwise wrongful," including conduct that is "motivated by personal animus." Doc. No. 26-1 at 7 (citing *Kern*, 757 N.W.2d at 663-64). Defendants similarly focus on motive, arguing that there is no evidence to suggest the Individual Defendants were "motivated by personal gain, personal animus towards [Vails], or any other improper purpose." Doc. No. 17-4 at brief page 13.

Because of this focus on motives, the analysis of the "improper" element in this case is strikingly similar to my prior analysis of Iowa's qualified immunity. I agree with the defendants that there is no evidence that could support a finding that any of the Individual Directors acted (or failed to act) because of an improper motive, such as fraud, personal gain or personal animus. Vails' argument to the contrary is long on hyperbole and speculation, but devoid of citations to supporting evidence. At most, she has raised an issue as to whether the Individual Defendants made good managerial judgments. As a matter of law, the record falls far short of supporting a finding that the Individual Defendants improperly interfered with the Agreement.

To conclude, there are three separate and independent grounds on which I will grant defendants' motion for summary judgment on Count III: (a) the Individual Defendants are immune from personal liability pursuant Iowa Code section 504.901; (b) the Individual Defendants are entitled to Iowa's common law qualified immunity protecting corporate directors from liability for interference with the corporation's contracts and (c) Vails has failed, as a matter of law, to raise a genuine issue of material fact as to whether the Individual Defendants intentionally and improperly interfered with the Agreement.

### 3. *Fraud*

In Count IV, Vails claims the Individual Defendants are liable to her for fraud. Although I have already determined that her claims against the Individual Defendants

must be dismissed pursuant to Iowa Code § 504.901, I will address the merits of her fraud claim. To prevail on a claim of fraudulent misrepresentation, Vails must prove: (1) a representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) reliance; and (7) resulting injury and damage. *Whalen*, 545 N.W.2d at 294. She has the burden of establishing fraud by a preponderance of clear, satisfactory, and convincing evidence. *Robinson v. Perpetual Servs. Corp.*, 412 N.W.2d 562, 565 (Iowa 1987).

Vails devoted barely one page of her resistance brief to her fraud claim. Doc. No. 26-1 at 10-11. Her abbreviated argument focuses solely on a theory that the Individual Defendants did not intend to live up to the promises made to Vails in the Agreement. *Id.* In other words, the only "representations" that form the basis of her fraud claim are the promises contained in the fully-integrated written contract between Vails and UCHC. Her resistance identified no other alleged representations.

Vails' effort to build a fraud claim from the alleged failure to live up to contractual promises fails as a matter of law. First, the promises in the Agreement were made by UCHC, not by any of the Individual Defendants. As I noted earlier, Vails admits that her negotiations as to the terms of the Agreement were with Seagren, not with any member of UCHC's board. Vails does not identify a single, false representation made to her by any of the Individual Defendants. That failure, alone, is fatal to her fraud claim.

Second, even if the promises made by UCHC in the Agreement could be considered "representations" that were made to Vails by each of the Individual Defendants, she has failed to produce evidence that those representations were fraudulent. The tort of fraud "occurs at the time the representations are made, not when they later prove to be false." *Grahek v. Voluntary Hosp. Coop. Ass'n of Iowa*, 473 N.W.2d 31, 35 (Iowa 1991). As such, a promise to perform a future act is not fraudulent unless it was made with a contemporaneous intention not to perform. *Robinson,* 412 N.W.2d at 565. The fact that the promise was not performed does not,

alone, prove the promissor did not intend on keeping it when it was made. *Id.* Instead, Vails must present "affirmative evidence" that the promisor had no intention to perform when the promise was made. *See Magnusson Agency v. Public Entity Nat'l Company–Midwest*, 560 N.W.2d 20, 28–29 (Iowa 1997); *see also Brown v. North Central F.S., Inc.*, 987 F. Supp. 1150, 1157-58 (N.D. Iowa 1997). Such "affirmative evidence" could include evidence that, at the time the promise was made, the promisor would have been unable to perform it or had already undertaken action that was inconsistent with the promise. *See, e.g., Brown*, 987 F. Supp. at 1158.

Vails has pointed to no such "affirmative evidence" that any Individual Defendant had no intention of having UCHC perform its promises at the time the Agreement was formed. She simply argues that the Individual Defendants later failed to "live up to" those promises. Such a claim, if true, gives rise to a claim against UCHC for breach of contract. It does not support a claim of fraud against any members of UCHC's board of directors.

The Individual Defendants are entitled to summary judgment on Count IV because they are immune from personal liability pursuant to Iowa Code section 504.901. In addition, Vails has failed, as a matter of law, to raise a genuine issue of material fact as to whether any of the Individual Defendants committed the tort of fraudulent misrepresentation. For both of these reasons, I will enter summary judgment in favor of the defendants with regard to Count IV.

### C.  Damages For Breach of Contract

As I noted earlier, defendants do not seek entry of summary judgment with regard to Count I, which is Vails' claim for breach of contract. However, they do argue that certain damages claimed by Vails are, as a matter of law, beyond the scope of recoverable damages for breach of an employment contract. Specifically, they argue that damages relating to the purchase, sale and maintenance of Vails' home in Storm Lake must be stricken.

Vails' list of alleged damages does include several items that relate to her home in Storm Lake. For example, she seeks damages based on: (a) "Home loan-cash at purchase" in the amount of $51,325.80, (b) "Mortgage & Interest x 3 yrs" in the amount of $109,069.92, (c) "Second Mortgage" in the amount of $90,000.00, (d) "Interest on 2nd x 2 years" in the amount of $10,800.00 and (e) "Home maintenance – unoccupied" in the amount of $7,200.00. Doc. No. 20-1 at brief pages 6-7. Defendants take the position that even if the jury finds for Vails on her claim for breach of contract, no housing-related damages are recoverable.

The Iowa Supreme Court has explained contract damages as follows:

> Distinct from the general rule for damages based on commitment of a tort, damages based on breach of a contract must have been foreseeable or have been contemplated by the parties when the parties entered into the agreement. Whether the damages were reasonably anticipated by the parties when the contract was formed may be discerned from "the language of the contract in the light of the facts, including the nature and purpose of the contract and circumstances attending its execution." Damages which a reasonable person would expect to follow from breach of a contract are direct and thus should be awarded.

*Kuehl v. Freeman Bros. Agency, Inc.*, 521 N.W.2d 714, 718 (Iowa 1994) [citations omitted]. In addition, "the damages [must] have some nexus with the breach, *i.e.*, the damages recoverable for a breach of contract are limited to losses actually suffered by reason of the breach and must relate to the nature and purpose of the contract." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 847 (Iowa 2010).

In *Royal Indemnity*, the Court looked to the Restatement and its comments for further clarification of the scope of allowable damages:

> Similarly, the Restatement (Second) of Contracts provides:
>
> > (1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.

> (2) Loss may be foreseeable as a probable result of a breach because it follows from the breach
>
>> (a) in the ordinary course of events, or
>>
>> (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.

Restatement (Second) of Contracts § 351, at 135 (1981). This section is further amplified in the comments:

> A contracting party is generally expected to take account of those risks that are foreseeable at the time he makes the contract. He is not, however, liable in the event of breach for loss that he did not at the time of contracting have reason to foresee as a probable result of such a breach. The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable.

*Id.* § 351 cmt. a, at 135.

*Royal Indem.*, 786 N.W.2d at 847. The Court then went on to discuss the "special circumstances" prong of Section 351(2):

> An exception exists to the general rule, however, where there is a loss "as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." Restatement (Second) of Contracts § 351(2)(b), at 135. "If loss results other than in the ordinary course of events, there can be no recovery for it unless it was foreseeable by the party in breach because of special circumstances that he had reason to know when he made the contract." *Id.* § 351 cmt. b, at 137. We adopted this rule from the seminal case, *Hadley v. Baxendale*, 9 Exch. 341, 344 (1854). *Vogan v. Hayes Appraisal Assocs., Inc.*, 588 N.W.2d 420, 425 (Iowa 1999).

*Id.* at 848.

Defendants note, correctly, that the Agreement is an employment contract and that its primary purpose was to establish the terms of Vails' employment. At the same

time, however, when the record is viewed in a light most favorable to Vails, there is evidence that Vails' housing situation was a "special circumstance" of which UCHC has reason to know when the Agreement was formed. UCHC knew Vails resided in California. The Agreement acknowledged that Vails and her family would have to relocate to Storm Lake and provided an allowance to reimburse Vails for certain relocation expenses. The Agreement further specified UCHC's facility in Storm Lake as being the location at which Vails was required to provide services and also imposed certain "on-call coverage" obligations on her. The jury could easily find that the Agreement contemplated, if not required, that Vails locate a residence within a reasonably close proximity to UCHC's clinic.

Moreover, according to Vails, her concerns about securing adequate housing in Storm Lake were a topic of discussion during negotiations. Seagren introduced Vails to a realtor, recommended a bank for a mortgage and accompanied Vails and her husband while they visited prospective homes in Storm Lake. In short, UCHC entered into the Agreement with full knowledge of the fact that Vails would need to locate housing in Storm Lake that was suitable for her family. Based on this knowledge, the jury could find that it was foreseeable to UCHC that a breach of the Agreement could cause Vails to incur some form of housing-related losses.

Despite this evidence, the defendants claim that Iowa law simply does not allow housing-related damages for an employer's breach of an employment contract. They refer me to *Cannon v. Nat'l By-Products, Inc.*, 422 N.W.2d 638 (Iowa 1988), as supporting their argument. In that case, the defendant employer appealed from an adverse verdict and, among other things, alleged that the trial court erroneously allowed plaintiff to testify that he lost his home by foreclosure after his employment was terminated. *Id.* at 642-43. The Court stated that damages based on the foreclosure of plaintiff's mortgage "[a]rguably" would be unrecoverable for breach of contract. *Id.* at 642. However, the Court also noted that the plaintiff had made no effort to prove the amount of those damages and, indeed, that the trial court's jury instructions had not

addressed that element of damages. As such, the Court found that any error in allowing the testimony was harmless. *Id.* at 643.

*Cannon* clearly does not hold that housing-related damages are never recoverable for breach of an employment contract. There is no indication that the plaintiff in that case relocated to accept employment with the defendant, or that the defendant was aware of a need for relocation.[13] Even in the absence of those factors, the Court simply commented that damages based on the foreclosure of plaintiff's mortgage would "arguably" be unrecoverable. I do not find *Cannon* to be instructive with regard to the facts of this case.

Defendants also refer me to two cases from other jurisdictions: *K Mart Corp. v. Ponsock*, 732 P.2d 1364 (Nev. 1987), and *Hodge v. Evans Fin. Corp.*, 823 F.2d 559 (D.C. Cir. 1987). In *K Mart*, the court summarily rejected plaintiff's argument that he was entitled to recover $11,000 in damages arising from the sale of his home after his employment was terminated. 732 P.2d at 1368. As in *Cannon,* however, nothing in the court's discussion of the facts indicates that the plaintiff relocated to accept employment with K Mart, or that the company was aware of a need for relocation. As such, I likewise find that *K Mart* is of no value here.

*Hodge* is closer to being on point. In that case, the plaintiff moved from Pittsburgh to Washington, D.C., to accept a job with the defendant, and it appears the defendant knew that relocation would be required. 823 F.2d at 561. The plaintiff's employment was terminated less than one year later and he sued for breach of an oral employment contract. *Id.* On appeal from a verdict in plaintiff's favor, defendant's arguments included attacks on certain elements of damages, including "$10,652 in expenses incurred in selling and purchasing his houses." *Id.* at 570-71. The court held

---

[13]Indeed, the opinion indicates that the plaintiff commenced employment with the defendant in Clinton, Iowa, in 1969, and continued that employment until he was discharged in 1981. 422 N.W.2d at 639.

that those expenses were not recoverable, as "they are not payments he would have received under the employment contract." *Id.* at 570.

This holding was based on the court's prior recitation of District of Columbia law, under which the damages for breach of an employment contract were said to be the compensation "that would have been due to the employee during the unexpired period of employment with appropriate reduction to present worth." *Id.* at 569 (quoting *District of Columbia v. Jones*, 442 A.2d 512, 524 (D.C.1982)). The court did not discuss the concept of consequential damages. Moreover, and in contrast to the Iowa Supreme Court, the court did not refer to the Restatement (Second) of Contracts as providing an accurate description of the damages available for breach.

I do agree that *Hodge* is consistent with defendants' position. However, it is a 25-year-old case from another jurisdiction that expressly applies a standard of damages that differs from current Iowa law. In other words, it is not very persuasive. I certainly would not rely on *Hodge* to hold that Iowa law never allows recovery of housing-related damages for breach of an employment contract.

The summary judgment record, when viewed in a light most favorable to Vails, gives rise to a genuine issue of material fact as to whether she is entitled to housing-related damages if the jury finds in her favor on her breach of contract claim. Specifically, the jury could find that "special circumstances" existed, that UCHC was aware of those circumstances when the Agreement was formed and that UCHC could have foreseen that breaching the Agreement would cause Vails to incur housing-related damages of some kind. As such, I will deny defendants' motion for summary judgment to the extent that it asks me to disallow any and all housing-related damages.

I am not, however, making a finding at this stage of the case that every housing-related element contained in Vails' itemization of damages will be submitted to the jury.

Some of the individual items appear – on the surface at least – to be absurd.[14] I do not intend to allow Vails to submit damages that are not supported by the evidence or that go beyond the purpose of compensatory damages, which is simply to place the injured party in the same position as if no breach had occurred. *See, e.g., Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.,* 579 N.W.2d 823, 831 (Iowa 1998). As such, and while I am denying defendants' blanket argument that no housing-related damages are permissible, defendants remain free to address specific items of alleged damages through motions in limine and/or motions at trial pursuant to Federal Rule of Civil Procedure 50.

## II.    *Vails' Motion For Partial Summary Judgment*

Vails seeks entry of summary judgment on Count I of her complaint (breach of contract). She argues there are no genuine issues of material fact that (a) UCHC breached the Agreement by not providing adequate time for her to perform her administrative duties and (b) the breach was material. She further asks me to find that her damages for breach are in the undisputed amount of $487,292.54[15], plus damages for loss of reputation to be determined by the jury. UCHC argues there are genuine issues of material fact as to whether UCHC breached the Agreement and whether any alleged breach was material. It also contends that Vails has not met her burden of proving she is entitled to the identified damages as a matter of law.

The Agreement, under the heading "Doctor's Duties," states:

> Doctor shall devote a minimum of 40 total hours per week toward the provision of clinical and administrative services hereunder to the Clinic ("Work Week") in alignment with the hours of operation of the Clinic.

---

[14]For example, I have substantial skepticism about Vails' request for damages in the amount of $90,000 based on a second mortgage.

[15]Vails calculation of the supposedly-undisputed damages arising from the alleged breach is set forth in her supporting brief. Those claimed damages include the housing-related damages I addressed in the preceding section. *See* Doc. No. 20-1 at brief pages 6-7.

> Unless otherwise agreed to by the parties in writing, Doctor shall devote
> on average a minimum of 24 hours per Work Week to providing patient
> care and a minimum of 16 hours per Work Week to providing
> administrative duties to the Clinic as the Medical Director.

Doc. No. 20-3 at 1. Job descriptions are attached to the Agreement as Exhibits A and B. Exhibit B, the description of the "Medical Director/Family Practitioner" duties, states that Vails will "[p]rovide direct medical care to clients of all ages, prescribes and dispenses medications. (Approx. 60% of FTE in this capacity, the remaining 40% of FTE for administrative duties)." *Id.* at 13.

The Agreement became effective on July 5, 2010, and Vails began seeing patients on July 15, 2010. Initially, she split clinical time with Dr. Salazar, the other physician at the clinic, and saw patients on 8 out of 19 workdays for the month of July. Doc. No. 25-1 at ¶ 11. The remainder of her time was available for administrative work.

Salazar was scheduled to leave the clinic at the end of July. *Id.* UCHC had entered into an agreement with another physician to begin employment in August 2010, but that agreement fell through. Doc. No. 17-1 at ¶¶ 45-46. UCHC began searching for locum tenens providers in mid-July until another permanent provider could be employed. *Id.* at ¶ 50. UCHC retained the locum tenens services of Dr. Jacobs, but he could not begin until the end of August. *Id.* at ¶¶ 51-52. Therefore, Vails was the sole clinical provider in August. During this time, Vails performed clinical work during normal business hours and reported working 15 to 20 hours overtime each week. Doc. No. 25-1 at ¶ 11.

In September, Vails was able to split clinical time with Jacobs. She reported spending approximately 69 hours on administrative work that month during normal business hours. Doc. No. 25-2 at ¶ 5.[16] UCHC expected Jacobs to continue providing

---

[16]Doc. No. 25-2 is defendants' SAF. Vails did not file a reply to defendants' SAF as required under Local Rule 56(d). As such, all facts contained in defendants' SAF are deemed admitted for purposes of Vails' motion.

locum tenens services into October, but he informed UCHC in early September that he was unavailable in October. Doc. No. 17-1 at ¶ 55. UCHC tentatively entered into an agreement with another physician, but this agreement fell through. *Id.* at ¶¶ 56-57. Vails again became the sole clinical provider at the beginning of October. Doc. No. 25-1 at ¶ 11. Prior to October 14, UCHC again secured the locum tenens services of Jacobs and he was scheduled to begin on October 18. Doc. No. 17-1 at ¶ 59. As I noted earlier, Vails left UCHC on October 14 and never returned to work.

In a breach of contract action, the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that he or she has performed all the terms and conditions required under the contract; (4) defendant breached the contract in some particular way; and (5) that plaintiff suffered damages as a result of the breach. *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa-Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993)). Only the fourth and fifth elements are in dispute here.

"Generally, questions of performance or breach are for the jury." *Iowa-Illinois Gas & Elec. Co.*, 497 N.W.2d at 825. "Under Iowa law, a breach must be material before it becomes a valid basis for unilateral termination of the contract by the non-breaching party, and materiality is an issue of fact for the jury." *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1239 (8th Cir. 1987) [citations omitted]. Iowa has adopted the Restatement (Second) of Contracts to define materiality of breach. The Restatement

> looks to the injured party and asks to what extent that party will be deprived of the benefit it reasonably expected, account being taken of the possibility of adequate compensation for that part. It also looks to the other party—to the possibility that it will suffer forfeiture, to the likelihood that it will cure its failure, and to the degree that its behavior comported with standards of good faith and fair dealing. Most significant is the extent to which the breach will deprive the injured party of the benefit that it justifiably expected.

*Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc.*, 599 N.W.2d 684, 692 (Iowa 1999) (quoting E. Allan Farnsworth, Farnsworth on Contracts § 8.16, at 496-97 (2d ed. 1998) (citing Restatement (Second) of Contracts § 241)).

Viewing the evidence in the light most favorable to UCHC, as the resisting party, I find there are genuine issues of material fact as to whether UCHC breached the Agreement and whether any such breach was material. The plain language of the Agreement states that Vails would devote "on average a minimum of 24 hours per week to clinical duties and 16 hours per week to administrative duties." This language does not guarantee Vails forty percent of each and every week to perform administrative duties. Because the Agreement included an initial term of three years, there is a genuine issue of material fact as to whether a provision describing an "average" number of hours was breached after only three months of performance.

This conclusion is buttressed by the fact that Vails was able to devote significant time to administrative duties during the months of July and September, when another physician was available to see patients. While UCHC's difficulties in securing locum tenens coverage during August and the first part of October increased Vails' clinical workload, reasonable jurors reviewing Vails' entire (albeit short) tenure at UCHC could find that UCHC did not breach the "administrative duties" provision of the Agreement.

Even if a breach did occur, I could not declare it to be material as a matter of law. As noted above, the most important factor is the extent to which the breach deprived Vails of a benefit she justifiably expected. *Van Oort,* 599 N.W.2d at 692. Reasonable jurors considering the contract as a whole, and all of the events and circumstances that occurred during Vails' employment at UCHC, could disagree as to whether Vails was deprived of a substantial benefit. Other factors, such as whether UCHC acted in good faith and whether it was likely that UCHC would cure the breach, likewise present issues of fact for the jury. I note, for example, that there is evidence of UCHC's ongoing efforts to retain the services of other physicians. There is also

evidence that before Vails left UCHC for good on October 14, UCHC had already arranged for Jacobs to start seeing patients again beginning October 18.

In short, there are genuine issues of material fact on the issues of breach and materiality that preclude entry of summary judgment for Vails on Count I of her complaint. As such, I will deny her motion for partial summary judgment.[17]

## CONCLUSION

Based on the foregoing:

1.    Defendants' motion (Doc. No. 17) for partial summary judgment is **granted in part and denied in part**. The motion is granted in that Counts II, III, IV and V of the complaint are hereby **dismissed**. The motion is denied in that plaintiff's request for damages relating to the purchase, sale and maintenance of her home is not stricken.

2.    Plaintiff's motion for partial summary judgment (Doc. No. 20) is **denied**.

3.    Trial, on Count I only, will begin as scheduled on January 22, 2013.


**IT IS SO ORDERED.**

**DATED** this 5th day of December, 2012.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

---

[17]Because I will deny Vails' motion for summary judgment with regard to Count I, I need not address her claim that various amounts and items of damages are undisputed. I do note, however, that I find there to be genuine issues of material fact with regard to the issue of damages. As such, if the jury finds for Vails on Count I, the amount of damages for breach of contract will be determined by the jury, not by me.